FILED

2025 Oct-22  AM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANGEL NEAL, *et al.*,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| **v.** } | **Case No.:  2:23-cv-01139-MHH** |
| } | |
| **TOWN & COUNTRY FORD** } | |
| **LLC,** } | |
| } | |
| **Defendant.** } | |

## AMENDED MEMORANDUM OPINION AND ORDER[1]

Plaintiffs Angel Neal and Taylor Thornton have sued their former employer, Town & Country Ford LLC.  (Doc. 1, p. 2, ¶¶ 5–7).  In addition to claims for sex discrimination and harassment under Title VII, the plaintiffs have asserted state-law tort claims for invasion of privacy, outrage, and negligent or wanton supervision and retention.  (Doc. 1, pp. 5–10, ¶¶ 43–84).  Town & Country has filed a motion for summary judgment on the plaintiffs' state-law claims.  (Doc. 17).

This opinion addresses Town & Country's motion.  The opinion begins with the standard used to evaluate summary judgment motions.  Consistent with that standard, the Court discusses the facts of this case, viewing the evidence in the light

---

[1] This memorandum opinion and order resolves Plaintiff's motion for clarification and/or reconsideration, (Doc. 34), and supersedes this Court's September 30, 2025 memorandum opinion and order, (Doc. 31).

most favorable to Ms. Neal and Ms. Thornton, and considers the parties' legal arguments.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also*

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Because the Court is exercising supplemental jurisdiction over the plaintiffs' state-law claims, Alabama law governs the analysis of these claims. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259–60 (11th Cir. 2015) (citations omitted).[2] The burden of proof concerning the state-law claims "is a substantive issue and is therefore controlled by state law." *See Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990) (citations omitted). In Alabama, "proof by substantial evidence shall be required to submit an issue of fact to the trier of the facts." ALA. CODE § 12-21-12(a). "Substantial evidence" means "evidence of such quality and weight that reasonable and fair-minded persons

---

[2] The plaintiffs' Title VII claims arise under federal law, so the Court has federal question jurisdiction over these claims. 28 U.S.C. § 1331. Under 28 U.S.C. § 1367, because the plaintiffs' state-law claims "are so related to" the plaintiffs' Title VII claims such "that they form part of the same case or controversy," the Court exercises supplemental jurisdiction over the plaintiffs' state-law claims. *See* § 1367(a).

in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven." ALA. CODE § 12-21-12(d).

## II.

### <u>Angel Neal</u>

Town & Country operates a Ford dealership. (*See* Doc. 18-10, pp. 12, 14–18). In August of 2021, Town & Country hired Ms. Neal to work in its new car sales department. (Doc. 18-1; Doc. 18-2, pp. 18–19). Her supervisors included Brian Smith, Greg Cooks, Jerome Edwards, Chris Pierce, and Savannah Brooks. (Doc. 18-7, pp. 1–2). In late May or early June of 2022, Ms. Neal requested a transfer to pre-owned car sales because four employees in new sales "antagonized" and "harassed" her "every single day." (Doc. 18-2, pp. 19–21).

Ms. Neal identified her harassers as Fred Williams, Jauwan Moore, Eric Washington, and Mr. Smith. (Doc. 18-2, p. 21). Ms. Neal recalled that Mr. Williams made "sexually offensive comments" three times per week, Mr. Moore made such comments five times per week, Mr. Washington made such comments four days per week, and Mr. Smith made such comments two days per week. (Doc. 18-2, p. 36). She experienced "six or seven comments" per day. (Doc. 18-2, pp. 36–37). The four employees also sexually propositioned Ms. Neal. (Doc. 18-2, p. 37).

When Ms. Neal asked for a transfer, she recounted to Kyle Sain and Mitchell Watts, members of Town & Country's ownership, examples of the harassment she experienced:

> I went over some things that happened in April [of 2022 with Mr. Sain], which was what made me actually want to go ahead and move, which was Jauwan Moore pretty much pulling my hair, slapping me in the face, grabbing my arms.
>
> I let [Mr. Sain] know one incident was one day I was just sitting at my desk. [Mr. Moore] comes up and says, "You look like you've been working out."
>
> And I said, "I have."
>
> And he squeeze[d] both of my arms, and I squealed. And Brian Smith turned around and said, "What" – he said, "What are you guys working on?"
>
> And [Mr. Moore] said, "Oh, I'm just telling Angel she looks like she's been working out."
>
> And I was like, "[Mr. Smith], did you see him? Did you see that?"
>
> And then [Mr. Moore] slapped me in my face and said, "Shut the fuck up."
>
> And I just got up and walked away because I just asked my manager if he seen it, and he just let it bypass.
>
> And when I walked away, [Mr. Smith] looked at my butt and said, "Her ass ain't growing. She ain't been working out." . . .
>
> I told [Mr. Sain and Mr. Watts] about every time when I come in in the morning, [Mr. Moore] is saying, "What's up, bitch?" or "What's that hoe doing?" or calling me a slut, a cunt, just cussing at me for no reason.

(Doc. 18-2, pp. 22–25; Doc. 18-10, p. 12; *see also* Doc. 18-2, p. 112).[3]  Management

approved Ms. Neal's transfer, and she worked in pre-owned car sales for two or three

months.  (Doc. 18-2, pp. 19, 27).  During this time, when Ms. Neal visited new car

sales:

> [She] was treated disrespectfully.  Same thing from Jauwan Moore,
> saying – calling [her] bitch, slut, hoe, cunt, cussing [her] out for no
> reason.
>
> Eric Washington pretty much saying everything on the lines of, "You
> fuck with nothing but white people.  If you had some" – "Why don't
> you come over to the dark side, fuck with your own kinds?"

(Doc. 18-2, pp. 27–28).

> In addition to the harassment described above, Mr. Washington:
>
> [W]ould say things like:  "Come over to my desk, and let's fuck.  Let's"
> – "If you didn't fuck with white people, I'd show you a good time.  If I
> fucked with [B]lack women, I would show you" – "I would give you
> the best night of your life."

(Doc. 18-2, p. 32).  In December of 2021, Mr. Washington asked for Ms. Neal's help

in his pursuit of a sexual encounter with a coworker.  (Doc. 18-2, p. 111).  Mr.

Washington said to Ms. Neal:  "if I fucked [B]lack women, I would do you so right."

(Doc. 18-2, p. 111) (internal quotation marks omitted).

On one occasion, Mr. Washington walked over to Ms. Neal's desk and leaned

over her "like he was getting something."  (Doc. 18-2, p. 43).  Mr. Washington said:

---

[3] Ms. Neal also recounted, and experienced, harassment of a non-sexual nature.  (*See, e.g.*, Doc.
18-2, pp. 22–25).

"if you weren't such a bitch sometimes, I could show you the time of your life."
(Doc. 18-2, p. 112) (internal quotation marks omitted). After she asked him to move,
Mr. Washington "put his hand on [her] inner thigh and said, '[s]o where are we going
for lunch?'" (Doc. 18-2, pp. 43–44). An altercation ensued, and when Mr. Smith
asked Mr. Washington what had happened, Mr. Washington said he "was just trying
to see where her fine ass going for lunch." (Doc. 18-2, p. 44).

According to Ms. Neal, Mr. Moore "would say things like I'm a slave, I'm
dressed like a slave, I would be a porch monkey, a house slave, I would be – I'm too
caramel, so I'd be the woman in the house that gets fucked." (Doc. 18-2, p. 32; *see
also* Doc. 18-2, p. 110). In December of 2021, Mr. Moore told Ms. Neal: "I see all
these white people talking to you . . . why don't you fuck a [B]lack person for once?"
(Doc. 18-2, p. 110). Ms. Neal also recounted the following interaction in the spring
of 2022:

> [O]ne day I was speaking with one of the service advisors, and [Mr.
> Moore] comes over and yanks my arm and says, "Shut the fuck up.
> Shut the fuck up."
>
> And I'm like, "Get off of me. Get off of me. Move" or whatever.
>
> And he's like, "I told you to stop fucking with these white people I can
> show you" – "I can show you a good time," or something like that, "if
> you just give me a chance."

(Doc. 18-2, pp. 29, 30; *see also* Doc. 18-2, p. 111).

According to Ms. Neal, Mr. Williams would make comments about Ms. Neal:

> [O]nly fucking with white – fucking white men, that happened multiple times.

> He would say things on the lines of, "Angel, you only talk to Blake Brown, Chesley Farris, Jay Mathis. You must be fucking one of them" and – or "You must be fucking all of them."

(Doc. 18-2, p. 39; *see also* Doc. 18-2, pp. 32, 112, 113). When Ms. Neal returned from telling a manager about Mr. Williams's comments, Mr. Williams said "You must be fucking [the manager] too, considering you ran straight to him." (Doc. 18-2, p. 39; *see also* Doc. 18-2, p. 112). Ms. Neal testified that Mr. Smith would participate in Mr. Washington and Mr. Moore's conversations about "what they'd do to [her], how [she] need[ed] to come to the dark side. [Mr. Smith] was in some of those conversations because they came up frequently, not just in those specific examples." (Doc. 18-2, p. 42).

In early 2022, when Ms. Neal's mother and aunt came to Town & Country to deliver Ms. Neal's lunch, Mr. Moore said:

> "I would like to see your mom without that uniform on." He said if she looked like an older version of me, he swore to God he will fucking wear her back out. He was doing humping motions in the air. [Mr.] Moore then went to [Mr.] Smith and [Mr.] Washington and said, "y'all see Angel's mama. Tell me that hoe ain't fine." [Ms. Neal] walked up to [Mr.] Smith and asked them to stop. [Mr.] Smith said, "that's her mama, come on now." [Mr.] Washington said to [Mr.] Moore, "but her twin can get this dick." [Mr.] Moore said he was just playing and called [Mr.] Washington a "damned fool." They all laughed and [Ms. Neal] walked away. [She] told [Mr.] Smith later that [she] felt disrespected, and he said, "these cats have never seen your mom or anyone in your family, they just went a little crazy." [Ms. Neal] told [Mr. Smith] it was him, too. [Mr.] Smith said, "my bad man, your mama is fine. No

8

disrespect." He then asked if [Ms. Neal's mother] had a boyfriend. [Ms. Neal] did not answer. He said, "I'll just ask her the next time she comes up here."

(Doc. 18-2, pp. 110–11).

In March of 2022, when Ms. Neal wore a dress to work, Mr. Moore asked:

"[W]here are you going tonight?" [She] did not answer. [Mr.] Washington told him, "she's getting some dick tonight, that's why she's dressed like that. You must be getting your back blown out." [Ms. Neal] ignored them. [Mr.] Smith walked in and [Mr.] Moore said, "is an Angel dressed like she's going on a date?" [Mr.] Washington said, "man she's dressed like she's got a dick appointment." [Mr.] Smith said, "what does she look like? Ummmm . . . fucking Rosa Parks." All three of them laughed, [Mr.] Smith put his hand on [Ms. Neal's] shoulder and said, "Angel, you got a date tonight dressing like somebody's grandma." All three burst out laughing. [Ms. Neal] got up and left. As [she] was leaving, they were talking about how females can't take a joke.

(Doc. 18-2, p. 111).

On another occasion Mr. Moore and Mr. Washington "went through [Ms. Neal's] Facebook page, talked about how petite [she] was, how [she] would look under [her] clothes, how they'd fuck the shit out of [her]." (Doc. 18-2, p. 41; *see also* Doc. 18-2, pp. 111–12). Mr. Moore and Mr. Washington said that Ms. Neal "looked like [she] liked girls and maybe [she] would be open to a threesome" and that Ms. Neal "looked like [she] was crazy." (Doc. 18-2, p. 112). Mr. Washington remarked: "that bitch is crazy, but I like crazy. Have you ever had sex with a crazy person? That shit gets wild." (Doc. 18-2, p. 112) (internal quotation marks omitted).

Ms. Neal recalled that on another occasion:

> [Mr. Washington] said, "Hey, bitch.  You and your boyfriend broke up?"
> And I was like – I just turned around, and I looked at him.
>
> And he said, "I know she hear me.  I know she hears me."  He's like,
> "She can come back here and" – he said, "I know she hears me"
>
> And [Mr. Moore] said, "That's not how you" – "That's not how you get
> a lady" or "That's not how you" – "That's not how you get some pussy,"
> is what he said.
>
>  . . . [T]hat's when [Mr. Washington] said, "Come back to my desk, and
> let's fuck."

(Doc. 18-2, pp. 46–47; *see also* Doc. 18-2, p. 111).  During this conversation, Mr.

Washington speculated that Ms. Neal's boyfriend had a "small" penis.  (Doc. 18-2,

p. 111).

Ms. Neal's coworkers harassed her in front of other salespeople and

management.  (Doc. 18-2, pp. 41–42).  Ms. Neal also witnessed her coworkers harass

other female employees and engage in crude sexual conversation throughout 2022.

(Doc. 18-2, pp. 113–15).   Ms. Neal recalled that numerous members of the

management team, including Mr. Watts and Mr. Sain, witnessed the harassment.

(*See, e.g.*, Doc. 18-2, pp. 30–31, 47–49).  A female member of management told Ms.

Neal "to laugh it off because [women] [we]re in a man's business" and had "to have

thick skin."  (Doc. 18-2, pp. 47–48).  When Ms. Neal went to female members of

management, female managers said:  "I'm so tired of hearing stuff like this,"

"business can't continue this way," and "[t]hat's not just men being men.  These

women shouldn't have to work like this."  (Doc. 18-2, p. 51) (internal quotation

marks omitted). The female managers made it clear they had witnessed harassment. (Doc. 18-2, p. 52).

One female manager believed that another female employee resigned because Mr. Moore hit the employee, degraded the employee, and called her a "bitch." (Doc. 18-2, pp. 53–54). Mr. Moore treated the "majority" of women at Town & Country in this manner. (Doc. 18-2, pp. 54–55). Eight female employees besides Ms. Thornton complained to management about the workplace atmosphere. (Doc. 18-2, pp. 55–56). Ms. Neal complained to management about harassment on a daily basis, and she complained to Mr. Watts and Mr. Sain a combined total of nearly fifteen times. (Doc. 18-2, p. 58).

On August 4, 2022, Ms. Neal made a formal complaint to Mr. Watts and a female manager. (Doc. 18-2, pp. 59–63). During the meeting, the female manager recounted instances of sexual harassment at Town & Country. (Doc. 18-2, pp. 62–63). Four days later, Ms. Neal made another complaint to Mr. Sain. (Doc. 18-2, pp. 65–66). Town & Country started an investigation into Ms. Neal's allegations. (Doc. 18-2, p. 67). During the investigation, the harassment worsened. (Doc. 18-2, p. 70). Coworkers continued to make degrading comments about women in front of Ms. Neal, but they would not refer to her directly. (Doc. 18-2, p. 71). Ms. Neal informed Mr. Sain, but he dismissed the conversation as "locker room talk." (Doc. 18-2, p.

71).  Town & Country did not terminate any employees at the conclusion of the investigation.  (Doc. 18-2, p. 72).

Ms. Neal resigned at the end of September 2022.  (Doc. 18-2, p. 78).  The harassment Ms. Neal experienced has left her unable to sleep and unable to perform her work, has made her "uncomfortable" and "anxious," has diminished her happiness, has made her "scared" to interact with management in other jobs, and has made her second-guess her decisions.  (Doc. 18-2, pp. 93–98).

### Taylor Thornton

Town & Country hired Ms. Thornton in August of 2020.  (Doc. 18-4).  Ms. Thornton worked as a sales associate in new car sales until the summer of 2021.  (Doc. 18-3, pp. 20–21).  Her supervisors included Mr. Smith, Mr. Cooks, Mr. Edwards, Mr. Pierce, and Ms. Brooks.  (Doc. 18-7, pp. 1–2).  Town & Country eventually transferred Ms. Thornton to preowned sales.  (Doc. 18-3, p. 21).

Ms. Thornton asked Mr. Pierce for a transfer because of the workplace atmosphere in the new car department.  (Doc. 18-3, pp. 24–25).  Ms. Thornton explained to Mr. Pierce that she "was sick and tired of the way [she] was being treated at new car."  (Doc. 18-3, p. 23).  "Any time [she] would come into work," Mr. Washington made "pop comment[s]," sexual comments, and "derogatory

comments on a constant basis." (Doc. 18-3, p. 23).[4] Whenever a white female customer came to the dealership, Mr. Washington would remark: "Look at her fine ass. I'd hit that. I wonder if she has a husband. Do you think she'd let me hit it?" (Doc. 18-3, pp. 26–27). When Mr. Washington saw Ms. Thornton's now-husband, Mr. Washington asked about Ms. Thornton's sex life and if her husband took care of her. (Doc. 18-3, pp. 40–41). Mr. Washington also asked Ms. Thornton if a job applicant "liked [B]lack men." (Doc. 18-3, p. 71; *see also* Doc. 18-3, p. 146).

Mr. Washington propositioned Ms. Thornton. (Doc. 18-3, pp. 33–36). Shortly after she started working at Town & Country, Mr. Washington texted her: "You like choco don't you? I see how you look at me. Like IMA caramel candy bar . . . Yes or No!!" (Doc. 18-3, p. 34; Doc. 18-5, p. 1; *see also* Doc. 18-3, p. 145).[5] Just before Ms. Thornton's transfer, in front of Mr. Smith, Mr. Washington approached Ms. Thornton, grabbed her thigh, and said: "Why won't you ever give it a chance? I know you haven't had any chocolate dick." (Doc. 18-3, p. 33) (internal quotation marks omitted). Mr. Smith retorted: "She's just not ready for it." (Doc. 18-3, p. 33) (internal quotation marks omitted). After Mr. Washington found out that Ms. Thornton had gotten engaged in the fall of 2021, he asked her: "Well, before you sit

---

[4] Ms. Thornton described a "pop comment" as Mr. Washington berating her if she did not speak to him "the way he wanted [Ms. Thornton] to speak to him." (Doc. 18-3, p. 26). Mr. Washington would "start cussing" at her. (Doc. 18-3, p. 26).

[5] Mr. Washington sent this text message in August of 2020. (Doc. 18-5, p. 1).

there and walk down the aisle, why don't you just give it one last shot?  Because after you get married, you'll never have the opportunity again."  (Doc. 18-3, pp. 35–36) (internal quotation marks omitted).  After Ms. Thornton transferred to preowned sales, Mr. Washington asked her what her "mouth do and how much would it take." (Doc. 18-3, p. 35; *see also* Doc. 18-3, p. 148).

Mr. Washington grabbed Ms. Thornton underneath her arm, yanked and pulled on her without permission, put his hand around her waist and "move[d]" her, and rubbed on her arm, elbow, and knee.  (Doc. 18-3, p. 37).  Mr. Washington's touching occurred "about ten times" during her employment.  (Doc. 18-3, p. 38).

Mr. Smith talked about women he dated and about his sexual experiences. (Doc. 18-3, p. 134; *see also* Doc. 18-3, p. 146).  Mr. Smith and Mr. Washington "would swap sex stories . . . in the sales room, going into graphic details of sexual encounters, including hitting it from behind and tying the women up."  (Doc. 18-3, p. 146).  Ms. Thornton testified that the harassment occurred "[e]very other day, if not every day," depending on Mr. Washington's and Mr. Smith's moods.  (Doc. 18-3, p. 24).

Numerous members of Town & Country's management witnessed the harassment.  (Doc. 18-3, p. 48).  Ms. Thornton attempted to complain about the workplace environment on one occasion, and she successfully complained on two other occasions.  (Doc. 18-3, pp. 48–51, 52–53).  Ms. Thornton complained to Ms.

14

Brooks and Mr. Cooks "throughout" her (Ms. Thornton's) employment. (Doc. 18-3, pp. 53–54, 55; *see also* Doc. 18-3, p. 148). Ms. Brooks agreed to take Ms. Thornton's concerns up the flagpole. (Doc. 18-3, pp. 54–55). Ms. Thornton also complained to Mr. Edwards and other Town & Country employees. (Doc. 18-3, pp. 56–57).

Ms. Thornton witnessed Mr. Washington harass one female coworker "constantly," and Ms. Thornton saw employees harassing other female coworkers. (Doc. 18-3, pp. 58–63, 65, 66–69, 71, 146–49). Concerning Ms. Neal, Ms. Thornton witnessed:

> [Mr.] Smith talking down to her, calling her ignorant and stupid, along with most of the other females, and that her face was just what was the best part of her and that she was dumber than a box of rocks and those type of remarks, her crayon isn't that sharpened and sharpest tool in the shed and that her face was the only thing they [sic] had going for her.

(Doc. 18-3, p. 76; *see also* Doc. 18-3, p. 147). Ms. Thornton witnessed Mr. Washington, Mr. Moore, and Mr. Smith tell Ms. Neal that Ms. Neal only liked white men and ask Ms. Neal about her dating and sex lives. (Doc. 18-3, p. 76–77). Ms. Thornton overheard Mr. Washington proposition Ms. Neal "every once in a while." (Doc. 18-3, p. 78).

Ms. Thornton voluntarily left her employment with Town & Country in early September of 2022. (Doc. 18-7, p. 1; Doc. 18-3, pp. 87–88). Ms. Thornton has post-traumatic stress disorder from participating in group messages with Town & Country

employees.  (*See* Doc. 18-3, p. 111).  When she hears a group message notification from an application called GroupMe, she shivers and jumps.  (Doc. 18-3, p. 113). She also has dreamed about GroupMe and about Mr. Washington berating her.  (Doc. 18-3, p. 113).

While at Town & Country, Ms. Thornton experienced dread about going to work, and she would cry during her commute.  (Doc. 18-3, p. 114).  Town & Country left Ms. Thornton "riddled with anxiety," and she has difficulty interacting with male coworkers.  (Doc. 18-3, pp. 115, 120–21, 135).  Ms. Thornton suffers from nausea, sweating, and shaking.  (Doc. 18-3, pp. 119–20).

***

Town & Country's employment manual prohibits sexual harassment.  (Doc. 18-10, pp. 227–35).  Town & Country required employees to take a sexual harassment test in April of 2022.  (Doc. 18-2, p. 79).  Management treated the test as a joke, quipping that Mr. Washington and Mr. Moore would get "fired" or "fail" the test.  (Doc. 18-2, pp. 79–81).  Ms. Thornton testified that Town & Country did not provide much on-the-job training.  (Doc. 18-3, p. 43).  Town & Country did not review its policies and procedures with employees.  (Doc. 18-3, p. 43).

### III.

### A.

Under Alabama law:

16

> To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show:  (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation.

*Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 323 (Ala. 1989)).[6]  As the Alabama Supreme Court has recognized, this inquiry depends on the particular facts of a case.  *See Atmore*, 719 So. 2d at 1194 (citations omitted).

In *Busby v. Truswal Systems Corp.*, 551 So. 2d 322 (Ala. 1989) (per curiam), the Alabama Supreme Court concluded that three plaintiffs' invasion of privacy claims based on their supervisor's conduct could survive summary judgment.  551 So. 2d at 324.[7]  The supervisor invited two of the plaintiffs to swim in a pool with him, naked, asked a plaintiff if he could warm his hands in her pockets, and made at least seven lewd and sexually explicit comments directly to one or more of the plaintiffs.  *Busby*, 551 So. 2d at 324.  For example, the supervisor "said that he wished that the plaintiffs would come to work braless and wear less clothing" and

---

[6] In the context of this case, where the plaintiffs have sued their former employer, the plaintiffs also must show that the "employer is liable for the intentional torts of its agent."  *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999); *Minnifield v. Ashcraft*, 903 So. 2d 818, 827 (Ala. Civ. App. 2004) (characterizing invasion of privacy as intentional tort).  In its motion for partial summary judgment, Town & Country has not challenged its liability; Town & Country has challenged only whether its employees engaged in tortious behavior.  (*See* Doc. 20, pp. 15–22; Doc. 30, pp. 16–19).

[7] *See also Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 707 (Ala. 1983).

"told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated." *Busby*, 551 So. 2d at 324.

The supervisor also made a comment about his sex drive, indicating that "he could perform intercourse as fast as one of the machines at the plant could operate." *Busby*, 551 So. 2d at 324. He told another employee that "if she would give him 30 minutes with her[,] he would fill her pants in nine months for her." *Busby*, 551 So. 2d at 324. In addition, the supervisor acted like he would touch one of the plaintiffs in an inappropriate manner; stared at the plaintiffs' sexual anatomy; grabbed the plaintiffs, put his arm around the plaintiffs, and stroked the plaintiffs' necks; attempted to follow a plaintiff into the restroom; and followed a plaintiff at night. *Busby*, 551 So. 2d at 324.

In *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986), the plaintiff, Sheila McIsaac, sued her employer because of sexual harassment she experienced at the hands of its owner, Richard Oppenheimer. *McIsaac*, 495 So. 2d at 649–50. Mr. Oppenheimer told Ms. McIsaac about an affair he had with another employee, and he insinuated that he would like to have an affair with Ms. McIsaac. *McIsaac*, 495 So. 2d at 650. He then attempted to kiss her. *McIsaac*, 495 So. 2d at 650. A few weeks later, Mr. Oppenheimer gave Ms. McIsaac "a look that you don't normally get [] through your everyday association with your boss." *McIsaac*, 495 So. 2d at

18

650 (internal quotation marks omitted).  Mr. Oppenheimer asked her if she would have dinner with him.  *McIsaac*, 495 So. 2d at 650.  He called Ms. McIsaac and told her he would arrange a trip for her to visit him in another state.  *McIsaac*, 495 So. 2d at 650.  According to Ms. McIsaac:

> "There were several incidences that I would qualify as suggestive lurks or little innuendos. . . . I mean I can't tell you specific times and dates of the way that he would look at me or smile at me or wink at me or touch me, just like touch me on my arm or put his arm around me or something like that."

*McIsaac*, 495 So. 2d at 650.  The Alabama Supreme Court affirmed the trial court's order granting the employer's motion for summary judgment because Mr. Oppenheimer's "alleged intrusion and examination into McIsaac's private concerns fall short of that required to constitute this tort." *McIsaac*, 495 So. 2d at 652. [8]

Town & Country argues that while the facts of this case "may be unpleasant and profane, and violate work rules, [they] do not rise to the level of invasion of

---

[8] The Alabama Supreme Court's decision in *Atmore* occupies a middle ground between the *Busby* and *McIsaac* decisions.  In *Atmore*:

> [The plaintiff] presented evidence indicating that [her supervisor] made several lewd comments and asked [the plaintiff] to meet him outside of work hours for other than business purposes.  Further, [the plaintiff] presented evidence indicating that [her supervisor] looked up her skirt on more than one occasion.  These factual assertions constituted substantial evidence that [the supervisor] committed an invasion of privacy.

719 So. 2d at 1192, 1194 (citation omitted).

privacy" that the Alabama Supreme Court has deemed actionable.  (Doc. 20, pp. 15–22; Doc. 30, pp. 16–19).  The Court disagrees.

In *Busby*, the plaintiffs' supervisor made two propositions of a sexual nature: he asked two plaintiffs to swim with him in his pool, naked, and he asked one of the plaintiffs if he could warm his hands in her pockets.  *See* 551 So. 2d at 324.  The supervisor also attempted to follow a plaintiff into the restroom and at night.  *See Busby*, 551 So. 2d at 324.

Here, Mr. Moore propositioned Ms. Neal for sex twice, telling her that he could show her "a good time" if she gave him "a chance," and asking her on one occasion why she would not "fuck a [B]lack person for once."  (Doc. 18-2, pp. 29, 110, 111) (internal quotation marks omitted).  According to Ms. Neal, Mr. Smith, Mr. Williams, and Mr. Washington also propositioned her for sex.  (Doc. 18-2, p. 37).

Mr. Washington propositioned Ms. Neal for sex on four occasions.  He asked her to "come over to the dark side" and "fuck with [her] own kind[]."  (Doc. 18-2, p. 28).  He told her to "[c]ome over to [his] desk, and let's fuck" and that he would show her "a good time," the "best night" of her life.  (Doc. 18-2, p. 32).  On another occasion, he told Ms. Neal that "if [she] w[as]n't such a bitch sometimes, [he] could show [her] the time of [her] life."  (Doc. 18-2, p. 44).  When Mr. Washington requested Ms. Neal's help in seducing a coworker, he told Ms. Neal that if he "fucked

20

[B]lack women, [he] would do [Ms. Neal] so right." (Doc.18-2, p. 111) (internal quotation marks omitted).

Mr. Washington propositioned Ms. Thornton for sexual encounters on four occasions. (Doc. 18-3, pp. 33–36). Mr. Washington texted Ms. Thornton: "You like choco don't you? I see how you look at me. Like IMA caramel candy bar. . . . Yes or No!!" Doc. 18-3, pp. 34, 145; Doc. 18-5, p. 1). Mr. Washington asked Ms. Thornton: "Why won't you ever give it a chance? I know you haven't had any chocolate dick." (Doc. 18-3, p. 33) (internal quotation marks omitted). Mr. Smith joined in, saying: "She's just not ready for it." (Doc. 18-3, p. 33) (internal quotation marks omitted). When Mr. Washington found out that Ms. Thornton had gotten engaged, he said: "Well, before you sit there and walk down the aisle, why don't you just give it one last shot? Because after you get married, you'll never have the opportunity again." (Doc. 18-3, pp. 35–36) (internal quotation marks omitted). He also asked Ms. Thornton "what would [her] mouth do and how much would it take," referring to oral sex. (Doc. 18-3, p. 35).

In *Busby*, the supervisor made numerous lewd or sexually explicit comments to one or more of the plaintiffs. *See* 551 So. 2d at 324. Here, when Mr. Moore and Mr. Smith engaged Ms. Neal about exercising, Mr. Smith said: "Her ass ain't growing. She ain't been working out." (Doc. 18-2, pp. 22–23) (internal quotation marks omitted). Mr. Moore would frequently call Ms. Neal a "hoe" and a "slut,"

words loaded with sexual innuendo.  (Doc. 18-2, p. 25).  Mr. Moore told her that "[she was] too caramel, so [she would] be the woman in the [slave] house that gets fucked."  (Doc. 18-2, p. 32).  Mr. Washington engaged Ms. Neal about her sex life with her then-boyfriend, speculating that her boyfriend had a "small" penis, and Mr. Washington described her as a "fine ass."  (Doc. 18-2, pp. 44, 46–47, 111).

Mr. Williams theorized that Ms. Neal "must be fucking" other employees, including one of her managers.  (Doc. 18-2, p. 39).  When Ms. Neal wore a dress to work, Mr. Washington said:  "she's getting some dick tonight, that's why she's dressed like that.  You must be getting your back blown out."  (Doc. 18-2, p. 111).  Mr. Washington then said:  "man she's dressed like she's got a dick appointment." (Doc. 18-2, p. 111).  On another occasion, Mr. Moore and Mr. Washington discussed Ms. Neal's petite stature, "how [she] would look under [her] clothes, how they'd fuck the shit out of [her]," that she "looked like [she] liked girls and maybe [she] would be open to a threesome," and that sexual intercourse with a "crazy" woman like Ms. Neal "gets wild."  (Doc. 18-2, pp. 42, 111–12) (internal quotation marks omitted).

"Any time [Ms. Thornton] would come into work," Mr. Washington would make a sexual comment to her.  (Doc. 18-3, p. 23).  When Mr. Washington would see Ms. Thornton's now-husband, Mr. Washington would ask Ms. Thornton about her sex life with her now-husband and whether her husband took care of her.  (Doc.

18-3, pp. 40–41). Mr. Smith regaled Ms. Thornton with details about women he dated and his sexual experiences. (Doc. 18-3, pp. 134, 146). Mr. Smith and Mr. Washington would "swap sex stories . . . going into graphic details of sexual encounters, including hitting it from behind and tying women up." (Doc. 18-3, p. 146).

In *Busby*, the Alabama Supreme Court noted that the supervisor routinely grabbed the plaintiffs, put his arm around the plaintiffs, and stroked the plaintiffs' necks. *See* 551 So. 2d at 324. The supervisor also acted like he would touch a plaintiff in a sexual manner on one occasion and stared at the plaintiffs' sexual anatomy. *Busby*, 551 So. 2d at 324. As in *Busby*, Mr. Moore would grab Ms. Neal's arms. (Doc. 18-2, pp. 22–25); *Busby*, 551 So. 2d at 324. Mr. Washington put his hand on her inner thigh on one occasion. (Doc. 18-2, pp. 43–44). Mr. Smith stared at Ms. Neal's buttocks, and he put his hand on her shoulder. (Doc. 18-2, pp. 22, 111). When Mr. Moore and Mr. Washington looked through photographs of Ms. Neal on Facebook, they made comments about her appearance and hypothesized about her sexual proclivities. (Doc. 18-2, pp. 41, 111–12).

Mr. Washington would grab Ms. Thornton underneath her arm, "yank" and "pull" on her without permission, put his hand around her waist and "move" her, and rub her arm, elbow, and knee. (Doc. 18-3, p. 37). On one of the occasions that Mr. Washington propositioned Ms. Thornton, he grabbed her thigh. (Doc. 18-3, p. 33).

In *Busby*, the Alabama Supreme Court observed that the supervisor had directed a lewd comment to another employee and described his sexual prowess. *See Busby*, 551 So. 2d at 324. Here, in front of Ms. Neal, Mr. Moore, Mr. Washington, and Mr. Smith fantasized about having sexual intercourse with Ms. Neal's mother. (Doc. 18-2, pp. 110–11). Mr. Washington described his prowess in comments he made to Ms. Neal, indicating that he could show her a "good time," give her "the best night of [her] life," and "do [her] so right." (Doc. 18-2, pp. 32, 111, 112) (internal quotation marks omitted). Ms. Thornton overheard numerous sexual comments made to other employees and customers. When a white female customer would come to the dealership, Mr. Washington would say: "Look at her fine ass. I'd hit that. I wonder if she has a husband. Do you think she'd let me hit it?" (Doc. 18-3, pp. &–27). Ms. Neal testified that she experienced sexually offensive commentary "six or seven" times per day from Mr. Williams, Mr. Moore, and Mr. Smith. (Doc. 18-2, pp. 36–37). Ms. Thornton testified that Mr. Washington harassed her "[e]very other day, if not every day," depending on his mood. (Doc. 18-3, p. 24).

On this record, Town & Country's argument that Ms. Neal and Ms. Thornton experienced only an unwelcome touch "coupled with a few incidents of propositions, sex talk among the guys and cursing," (Doc. 30, p. 20), is akin to calling Hurricane Katrina a passing shower with a few wind gusts. On the invasion of privacy

24

spectrum, the facts of this case are far more egregious than those in *Busby*. In *Busby*, the plaintiffs endured the misconduct of a single supervisor. Here, three co-employees routinely bombarded Ms. Neal and Ms. Thornton with profanity and sexually harassing remarks and gestures for anyone within earshot to see and hear. The conduct occurred almost daily, and it involved sexual questions not only about the plaintiffs but about their family members as well. A jury must decide whether Town & Country correctly characterizes the conduct Ms. Neal and Mr. Thornton experienced as merely unpleasant and profane or whether the conduct constitutes an invasion of privacy under Alabama law.

Town & Country argues alternatively that the plaintiffs "have not demonstrated that they have suffered outrage and/or mental suffering necessary" for a jury to find that Town & Country employees invaded the plaintiffs' privacy. (Doc. 20, p. 22; Doc. 30, p. 19). Town & Country contends that the torts of invasion of privacy and outrage share a causation standard that requires the plaintiffs to show that "they suffered severe emotional distress as a result of the conduct." (*See* Doc. 20, pp. 22, 25–26; Doc. 30, p. 19). With respect to invasion of privacy, the Alabama Supreme Court has held that a plaintiff must show that a "reasonable person subjected to [the proven conduct] would experience outrage, mental suffering, shame, or humiliation." *Atmore*, 719 So. 2d at 1194 (citation omitted); *see also Busby*, 551 So. 2d at 323 (noting "wrongful intrusion into one's private activities"

must cause "outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities") (italics, internal quotation marks, and quotation omitted). This objective standard does not require the plaintiffs to show that they experienced mental suffering, though Ms. Neal and Ms. Thornton have done so, (Doc. 18-2, pp. 93-98; Doc. 18-3, pp. 114-15, 120-21, 135; *see* Doc. 27, p. 31). The standard asks only whether a reasonable person in the plaintiffs' circumstances would experience mental suffering, humiliation, or shame.

Indeed, in *Busby*, the Alabama Supreme Court did not conduct a separate causation inquiry before concluding that the plaintiffs had made out a claim for invasion of privacy. *See* 551 So. 2d at 324 ("A jury could reasonably determine from [the evidence outlined in this opinion] that [the supervisor] pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy"); *see also Atmore*, 719 So. 2d at 1194. Given the egregious nature of the conduct at issue, Ms. Neal and Ms. Thornton have met their burden of showing that Town & Country employees "pried or intruded" into their sex lives "in an offensive or objectionable manner and thereby invaded their right of privacy." *See Busby*, 551 So. 2d at 324. The plaintiffs have provided evidence of sexually intrusive conduct that would cause a person of ordinary sensibilities to experience mental suffering. Therefore, the Court denies Town & Country's motion for summary judgment on the plaintiffs' invasion of privacy claim.

**B.**

Under Alabama law, "[f]or a plaintiff to recover under the tort of outrage, she must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Reg'l Prime Television v. South*, 399 So. 3d 220, 246–47 (Ala. 2024) (internal quotation marks and quotation omitted).[9]  "The conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *South*, 399 So. 3d at 246–47 (internal quotation marks and quotation omitted).  "The tort of outrage is an extremely limited cause of action," but it applies in cases of "egregious sexual harassment."  *South*, 399 So. 3d at 246–47 (internal quotation marks omitted) (citing *Busby*, 551 So. 2d 322; other citations omitted).

---

[9] As with invasion of privacy, the Alabama Supreme Court has recognized an employer liability component to outrage claims. *See Busby*, 551 So. 2d at 326–28.  In the context of outrage, proving employer liability requires a showing beyond that required for proving employer liability on an invasion of privacy claim. *See Busby*, 551 So. 2d at 327–28 (finding factual question remained on employer's liability for invasion of privacy but that plaintiffs could not hold employer liable on outrage claim).  Town & Country has not challenged this aspect of the analysis.  (*See* Doc. 20, pp. 23–26; Doc. 30, pp. 19–21).

Town & Country argues that Ms. Neal and Ms. Thornton did not experience enough "sexual touching" and other sexual harassment for their coworkers' behavior to constitute extreme and outrageous conduct. (Doc. 20, pp. 24–25; Doc. 30, p. 20). In *Busby*, relying on the evidence discussed concerning invasion of privacy, the Alabama Supreme Court held that "the plaintiffs present[ed] evidence from which a jury could reasonably determine that [their supervisor]'s conduct rose to" the level necessary to establish the tort of outrage. 551 So. 2d at 324. Instances of sexual touching comprised one of the seventeen facts the *Busby* court considered in reaching its conclusion; the Alabama Supreme Court outlined individual propositions and lewd comments separately. *See* 551 So. 2d at 324. As discussed above, the extent and nature of the alleged sexual harassment in this case surpasses that in *Busby*. Therefore, the plaintiffs have met their burden of showing that Town & Country employees engaged in extreme and outrageous conduct.

Town & Country also argues that the plaintiffs did not experience emotional distress severe enough to support their claims for the tort of outrage. (Doc. 20, pp. 25–26; Doc. 30, pp. 20–21).[10] As Town & Country points out, the plaintiffs did not respond to this argument in their opposition brief. (*See* Doc. 27, pp. 31, 34–35; Doc.

_____

[10] As with its invasion of privacy analysis, the Alabama Supreme Court in *Busby* merged the causation inquiry into the overarching outrage analysis. *See* 551 So. 2d at 324. The *Busby* Court focused its analysis on the plaintiffs' burden of showing the employer's liability for the plaintiffs' supervisor's extreme and outrageous conduct. 551 So. 2d at 327–28. A subsequent decision from the Alabama Supreme Court considered the causation element as a standalone inquiry. *See Harrelson v. R.J.*, 882 So. 317, 322–23 (Ala. 2003).

30, pp. 20–21).  Because the plaintiffs have not responded to Town & Country's argument regarding an essential element of their outrage claims, the plaintiffs have abandoned those claims.  *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (citations omitted) (concluding party's "failure to brief and argue [an] issue during the proceedings before the district court [wa]s grounds for finding that the issue has been abandoned").  Therefore, the Court grants Town & Country's motion for summary judgment on the plaintiffs' outrage claims.

## C.

Counts Four and Five of the plaintiffs' complaint state claims for negligent or wanton supervision and retention against Town & County.  (Doc. 1, pp. 8–10, ¶¶ 69–84).  To succeed on a negligent or wanton supervision and retention claim premised on allegations of sexual harassment, the Alabama Supreme Court has held that a plaintiff first must prove "the underlying tortious conduct of an offending employee."  *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999) (italics omitted) (citation omitted).[11]  Next, a plaintiff must show that their employer:

> (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the

---

[11] Town & Country argues that the plaintiffs cannot survive summary judgment on their negligent or wanton supervision and retention claims because the plaintiffs have not met their burden of showing that Town & Country employees engaged in the requisite underlying tortious conduct. (Doc. 20, pp. 30–31; Doc. 30, p. 21).  As explained in this opinion, the plaintiffs have met their burden of showing that Town & Country employees invaded the plaintiffs' privacy.

employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take adequate steps to remedy the situation.

*Stevenson*, 762 So. 2d at 824 (internal quotation marks and quotation omitted). A plaintiff also must show that the defendant's negligence or wantonness caused the plaintiff to suffer damages. *See Hilyer v. Fortier*, 227 So. 3d 13, 22 (Ala. 2017) (internal quotation marks and quotation omitted).

As to the plaintiffs' negligent supervision and retention claims, Town & Country argues that the plaintiffs have not met their burden of showing cognizable damages. (Doc. 20, p. 26; Doc. 30, p. 21). The plaintiffs allege that they "suffer[ed] severe emotional distress, embarrassment, and humiliation" as a result of Town & Country's negligence. (Doc. 1, p. 9, ¶¶ 75, 83). "In negligence actions, Alabama follows the zone-of-danger test, which limits recovery of mental anguish damages to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Birmingham Coal & Coke Co. v. Johnson*, 10 So. 3d 993, 999 (Ala. 2008) (internal quotation marks and quotation omitted); *see also Brown v. First Fed. Bank*, 95 So. 3d 803, 818 (Ala. Civ. App. 2012) (citation omitted).

According to Town & Country, the plaintiffs have not shown that the suffered physical harm or an immediate risk of physical harm. (Doc. 20, p. 26; Doc. 30, p. 21). The plaintiffs have not responded to this argument in their opposition brief.

(*See* Doc. 27, pp. 35–37). Therefore, the plaintiffs have abandoned their negligent supervision and retention claims. *See Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326 (citations omitted)].

As to the plaintiffs' wanton supervision and retention claims, Town & Country argues that the plaintiffs have not shown that Town & Country engaged in wanton conduct. (Doc. 20, pp. 27–30; Doc. 30, pp. 21–22). "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty." *Hilyer*, 227 So. 3d at 22.

In *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981 (Ala. 1999), *rehearing denied*, (Ala. 2000), a female loan officer at a bank reported one of the bank's executives to the bank's "chief operations officer" for "making lewd and sexually suggestive comments to her" and for "touch[ing] her in an offensive manner." 761 So. 2d at 982. The bank's COO did not confront the alleged harasser, but he did inform the bank's CEO about the complaint. *Machen*, 761 So. 2d at 982. The CEO verbally reprimanded the alleged harasser but did not provide a written reprimand. *Machen*, 761 So. 2d at 983). The COO reported to the loan officer that the bank had spoken with the alleged harasser and informed him that future harassment would result in termination. *Machen*, 761 So. 2d at 983.

The alleged harasser's problematic behavior ceased for a time and then resumed. *Machen*, 761 So. 2d at 983. The loan officer did not report the renewed harassment, resigned, and later, her husband informed the bank that the loan officer had resigned because of renewed harassment. *Machen*, 761 So. 2d at 983. The bank issued a written memorandum to the alleged harasser requesting that he review the bank's sexual harassment policy. *Machen*, 761 So. 2d at 983. The loan officer sued the bank and two of its executives. *Machen*, 761 So. 2d at 982, 983. Among other claims, the loan officer asserted a claim for negligent or wanton investigation, supervision, training, and discipline. *Machen*, 761 So. 2d at 983.

The Alabama Supreme Court held that the loan officer had presented substantial evidence on her wanton investigation, training, supervision, and discipline claim. *Machen*, 761 So. 2d at 987. The Alabama Supreme Court noted that the bank wrote a written memorandum to the alleged harasser after the harassment resumed, even though the bank had informed the alleged harasser previously that it would terminate him for future infractions. *Machen*, 761 So. 2d at 987–88. Because of "the unique circumstances of th[e] case (especially the prominence of the alleged perpetrator)," the Alabama Supreme Court concluded that a reasonable jury could determine "that the bank defendants consciously chose to minimize the situation." *Machen*, 761 So. 2d at 988.

In *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993), the plaintiff alleged that the defendant's assistant store manager had "forced [the plaintiff] to engage in a sex act." 634 So. 2d at 1001, *superseded by statute on other grounds as stated in*, *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44 (Ala. 2001). Among other claims, the plaintiff asserted a claim for negligent or wanton training and supervision. *Cottingham*, 634 So. 2d at 1001.

The facts of the *Cottingham* case indicated that the defendant had hired the assistant manager based on his strong credentials and that the assistant manager performed his job well. *Cottingham*, 634 So. 2d at 1003. Still, when the company hired the assistant manager, management did not review with him the company's training manuals. *Cottingham*, 634 So. 2d at 1003. During the assistant manager's tenure, an employee complained that the assistant manager had made "an unwanted sexual advance" toward her. *Cottingham*, 634 So. 2d at 1003. Management confronted the assistant manager, informed him that the company did not tolerate such behavior, told him that future harassment would result in termination, and reviewed the company's sexual harassment policy with him. *Cottingham*, 634 So. 2d at 1003. The company did not meet with the complaining employee or prepare a written report. *Cottingham*, 634 So. 2d at 1003.

The Alabama Supreme Court indicated that the plaintiff had to support her wanton training and supervision claim with substantial evidence that management

"made a conscious decision to downplay the sexual harassment complaint that had been made against the" store manager, "knowing that to do so would likely result in [the store manager]'s mistreating a female customer or employee." *Cottingham*, 634 So. 2d at 1004. In concluding that the plaintiff had met her burden, the *Cottingham* court emphasized that the company had not trained the assistant manager properly. *Cottingham*, 634 So. 2d at 1004. The Alabama Supreme Court noted that a reasonable jury could conclude that the decisions to forgo an interview with the complaining employee and to not prepare a thorough report on the incident "would likely [have] give[n] [the assistant manager] another opportunity to demean or otherwise mistreat a female customer or employee." *Cottingham*, 634 So. 2d at 1004.

Here, Town & Country points out that it has a sexual harassment policy and that it required employees to undergo training. (Doc. 20, p. 27; Doc. 30, p. 21). Still, Town & Country did not review policies and procedures with employees, and Town & Country did not provide much in the way of on-the-job training. (Doc. 18-3, p. 43); *see Cottingham*, 634 So. 2d at 1004. Though Ms. Neal received Town & Country's employee handbook when she started her job there, she did not receive training concerning Town & Country's harassment and discrimination policies. (Doc. 18-2, pp. 78–79). Viewed in the light most favorable to the plaintiffs, though

Town & Country made employees take a sexual harassment training test, management treated the test as a joke. (Doc. 18-2, pp. 79–81; Doc. 18-3, p. 43).

Town & Country argues that Ms. Neal did not complain formally prior to August 4, 2022, and when she did complain, Town & Country undertook a reasonable investigation and found Ms. Neal's claim unsubstantiated. (Doc. 20, pp. 28–30; Doc. 30, pp. 21–22). But the evidence shows that Town & Country's management and employees witnessed the sexually harassing conduct before Ms. Neal complained. (*See, e.g.*, Doc. 18-2, pp. 30–31, 41–42, 47–49; Doc. 18-3, pp. 48, 58–63, 65, 66–69, 71, 76–78, 146–49). Female managers had indicated that the business could not continue with the existing workplace atmosphere. (Doc. 18-2, p. 51).

Accepting Ms. Neal's version of events as the Court must at this stage of the case, she complained to management daily, and she complained to Mr. Watts and Mr. Sain nearly fifteen times. (Doc. 18-2, p. 58). Ms. Thornton complained about her treatment on two occasions, she complained to Ms. Brooks and Mr. Cooks "throughout" Ms. Thornton's tenure, and she complained to Mr. Edwards and other Town & Country employees. (Doc. 18-3, pp. 48–51, 53–54, 55, 56–57, 148). Ms. Brooks agreed to take Ms. Thornton's concerns up the ladder. (Doc. 18-3, pp. 54–55). Eight other female employees complained to management about their work environment. (Doc. 18-2, pp. 55–56). When Town & Country investigated Ms.

Neal's formal complaint, the harassment worsened, and Mr. Sain dismissed the worsening conditions as "locker room talk." (Doc. 18-2, pp. 70–71). Because Town & Country management knew about the pervasive culture of sexual harassment but did not act prior to Ms. Neal's complaint, a reasonable jury could determine that Town & Country "consciously chose to minimize the situation," knowing that doing so "would likely give [the harassing employees] another opportunity to demean or otherwise mistreat" female customers or employees. *See Machen*, 761 So. 2d at 988; *Cottingham*, 634 So. 2d at 1004. On this record, the Court denies Town & Country's motion for summary judgment on the plaintiffs' wanton supervision and wanton retention claims.

## IV.

Accordingly, the Court grants in part and denies in part Town & Country's motion for partial summary judgment. The Court denies the motion as to the plaintiffs' invasion of privacy, wanton supervision, and wanton retention claims. The Court grants the motion as to the plaintiffs' other state-law claims.

The Clerk of Court shall please TERM Plaintiffs' motion for clarification and/or reconsideration (Doc. 34).

**DONE** and **ORDERED** this October 22, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE